LAWRENCE J. O'REILLY *vs.* DIRECTOR OF THE DIVISION
OF EMPLOYMENT SECURITY & another.[1]

Middlesex. March 5, 1979. — April 13, 1979.

Present: HENNESSEY, C.J., QUIRICO, KAPLAN, WILKINS, & ABRAMS, JJ.

*Employment Security*, Eligibility for benefits, Retirement. *Words.*
"Voluntarily."

A retiring employee who had the option under his employer's retire-
ment plan of continuing his employment until the end of the fiscal
year in which he attained age sixty-five or terminating his employ-
ment at the end of the month comprising his birthday and chose the
second alternative was entitled to unemployment benefits under
G. L. c. 151A, § 25(*e*). [842-846]

CIVIL ACTION commenced in the Third District Court of
Eastern Middlesex on August 2, 1977.

The case was heard by *Lack*, J.

*Paul Lichterman* for the plaintiff.

*Francis X. Bellotti*, Attorney General, & *Frank J. Scha-
raffa*, Assistant Attorney General, for the Director of the
Division of Employment Security, submitted a brief.

KAPLAN, J. For a period of nearly thirty-five years,
from 1942 through 1976, the plaintiff Lawrence J.
O'Reilly worked as a telephone operator for the Massa-
chusetts Institute of Technology. Until 1975 he was the
lone operator on the "graveyard shift" (10 P.M. to 8 A.M.);
thereafter, that job having been "phased out," he worked
with other operators on the 5 P.M. to midnight shift.

The retirement age at M.I.T. was fixed at sixty-five and
O'Reilly's sixty-fifth birthday fell on December 12, 1976.
Until some time in 1975, the M.I.T. retirement plan

---

[1] Massachusetts Institute of Technology.

rounded out the employee's sixty-fifth year at the end of the fiscal year in which he attained that age; in other words, the employee continued to work and was paid his regular salary to June 30 although he had reached the age of sixty-five at a date within the preceding twelve months, and his pension commenced from June 30. In 1975 M.I.T. altered its plan to provide that a retiring employee, instead of working to the end of the fiscal year, could at his option depart his employment and start his pension at the end of the month comprising his birthday.[2] The plaintiff ended his employment on December 31, 1976.

On February 22, 1977, the plaintiff, complying with the usual requisites, applied for unemployment benefits and was granted them commencing with the week of February 27. Massachusetts Institute of Technology requested redetermination, and in due course the Division of Employment Security disqualified the plaintiff, and declared he had been overpaid $76 previously received. The ground given was that the plaintiff had left work voluntarily (within the meaning of G. L. c. 151A, § 25[e], first paragraph, referred to below), in that he exercised a choice to leave on the date nearer his birthday. This decision was upheld within the agency and was affirmed on review by a judge of the Third District Court of Eastern Middlesex. The plaintiff claimed his appeal and the case is here on report. G. L. c. 151A, § 42. We confront a question of law on the undisputed facts above set forth. See *Keough* v. *Director of the Div. of Employment Security*, 370 Mass. 1 (1976); *Raytheon Co.* v. *Director of the Div. of Employment Security*, 364 Mass. 593, 595-597 (1974).

[2] The employer appears to have acknowledged in the present proceedings that it regarded earlier retirement by this plaintiff as saving it, for a period, the difference between full salary and pension; his job had been discontinued. The inference is invited that the change of the retirement plan was aimed by the employer at similar and comparable saving.

Where an employee has "left his work . . . voluntarily without good cause attributable to the employing unit or its agent," he is, generally speaking, ineligible for unemployment benefits during the ensuing period of unemployment, and his ineligibility for any benefits continues until he has secured another job and worked at least four weeks and in each such week earned an amount not less than the amount of the weekly benefit. G. L. c. 151A, § 25(e), first paragraph.[3] However, the same subsection (e) provides in its second paragraph, "An individual shall not be disqualified under the provisions of this subsection from receiving benefits by reason of leaving his work under the terms of a pension or retirement program requiring retirement from the employment notwithstanding his prior assent, direct or indirect, to the establishment of such program."[4]

---

[3] "No waiting period shall be allowed and no benefits shall be paid to an individual under this chapter . . . (e) For the period of unemployment next ensuing and until the individual has had at least four weeks of work and in each of said weeks has earned an amount equivalent to or in excess of his weekly benefit amount after he has left his work (1) voluntarily without good cause attributable to the employing unit or its agent (2) by discharge shown to the satisfaction of the director to be attributable solely to deliberate misconduct in wilful disregard of the employing unit's interest or (3) because of conviction of a felony or misdemeanor." (As amended through St. 1975, c. 684, § 78.)

[4] The second paragraph reads: "No disqualification shall be imposed if such individual establishes to the satisfaction of the director that he left his employment in good faith to accept new employment on a permanent full-time basis, and that he became separated from such new employment for good cause attributable to the new employing unit. An individual shall not be disqualified under the provisions of this subsection from receiving benefits by reason of leaving his work under the terms of a pension or retirement program requiring retirement from the employment notwithstanding his prior assent, direct or indirect, to the establishment of such program. An individual shall not be disqualified from receiving benefits under the provisions of this subsection, if such individual establishes to the satisfaction of the director that his reasons for leaving were for such an urgent, compelling and necessitous nature as to make his separation involuntary." (As amended through St. 1975, c. 684, § 78.)

The substance of the foregoing quoted sentence about retirement programs[5] was introduced into § 25(e) in 1958 by St. 1958, c. 677.[6] This was intended to overcome *Lamont* v. *Director of the Div. of Employment Security*, 337 Mass. 328 (1958). The case held that where a union had agreed with the employer through a collective bargaining agreement that a group of twenty-eight employees should be retired, the employees so retiring must be considered to be leaving "without good cause attributable to the employing unit or its agent,"[7] because, according to the court, they were leaving by reason (in part at least) of their own agreement to the retirement plan expressed through the instrumentality of the union.[8] Other courts felt able to take a less abstract view of employee volition, and reached a contrary result as to employees leaving work under retirement plans.[9] Our court invited legisla-

[5] The 1958 text was the same as the present text of the sentence except that by St. 1975, c. 684, § 78, the words "or retirement" were added after the word "pension," and the word "pension," which had appeared before the last word of the sentence, was deleted.

[6] The evolution of the language of the 1958 act is described in *Raytheon Co.* v. *Director of Div. of Employment Security*, 344 Mass. 369, 370-372 (1962). See also n.7 below.

[7] The 1958 statute, enacted after *Lamont*, prefaced this clause with the word "voluntarily" and struck the words "attributable to the employing unit or its agent," but the latter quoted words were restored in 1969 (St. 1969, c. 614, § 2). These changes do not appear significant to our discussion. It has long been an element of the law that a voluntary quit disqualifies. The question is as to the reading of the provision about retirement programs which is expressed as an exception to the category of the voluntary quit.

[8] It is not clear that the court would have been prepared to apply the same reasoning to employees hired after a retirement plan had gone into effect covering future as well as existing employees.

[9] The leading case was *Campbell Soup Co.* v. *Board of Review*, 13 N.J. 431 (1953) (Brennan, J.), which focused on the employees' actual volition at the time of departure. *Campbell Soup* was followed in *Warner Co.* v. *Unemployment Compensation Bd. of Review*, 396 Pa. 545 (1959); *Employment Security Comm'n* v. *Magma Copper Co.*, 90 Ariz. 104 (1961); *Duval Corp.* v. *Employment Security Comm'n*, 83 N.M. 447 (1972), and other cases collected in Annot., 50 A.L.R. 3d 880 (1973), which also notes those decisions taking the *Lamont* view.

844                                                 377 Mass. 840

O'Reilly *v.* Director of the Division of Employment Security.

tive intervention if a change of the law was desired (337 Mass. at 332), and that occurred in the 1958 statute, entitled "An Act liberalizing the eligibility provisions of the employment security law and providing that certain persons who leave their work shall not be disqualified from receiving benefits under said law."

The agency's position in the present case, if allowed to stand, would be contrary to a fair reading of the provision about retirement, and incidentally would revert to an abstract view of employee volition reminiscent of *Lamont*. It is symptomatic that the decision of the reviewing examiner, while citing the "voluntarily" language of the first paragraph of § 25(*e*), did not cite, and ignored the force of the statutory statement about retirement programs. That statement broadens eligibility for benefits by providing that an employee's departure from employment, "under the terms of a pension or retirement program requiring retirement from the employment," is not disqualifying—in such event, questions of quitting "voluntarily" or for "good cause" under the first paragraph are avoided; the question is whether there is a plan "requiring retirement.[10]

The plaintiff's case is within those terms. Reaching the age of sixty-five — an age that has been a common terminus under numerous public and private retirement schemes[11] — the plaintiff was obliged by the M.I.T. program to retire. His departure was inevitable, not less so because he was enabled to accelerate the final date some-

[10] The *Lamont* case did not consider whether the plan there involved was itself mandatory; rather it was inquiring whether the individual employee could be charged with having had a hand in adopting it and in that attenuated sense had elected to leave the job.

[11] See the cases and annotation in note 9 above. See also Report by the Select Committee on Aging, 95th Cong., 1st Sess., "Mandatory Retirement: The Social and Human Cost of Enforced Idleness" (August 1977), at 1-2, indicating that the age sixty-five practice originated with Bismarck's 1889 old age and survivors pension act.

377 Mass. 840                                                     845

O'Reilly v. Director of the Division of Employment Security.

what, or rather to make a choice between two dates each related to, although not coincident with, the date of birth. The statutory expression "requiring retirement" is easily read to include a case where some choice on the part of an employee exists but is thus strictly confined. If the expression is read as a reference to so called "mandatory" retirement programs, common understanding would not be strained by admitting the M.I.T. plan to this category.[12] Indeed, the subsection begins by disqualifying cases of voluntary quitting, then excepts cases of required retirement ("shall not be disqualified under the provisions of this subsection"). This suggests that the latter cases may have some residual element of choice without losing their character under the statute as "required."[13]

We are not suggesting here that the result should be the same where a plan, rather than staking retirement to a particular age, permits an employee to choose any date over a number of years as the cutoff.[14] Nor need we decide

---

[12] It may be surmised that some element of voluntariness or choice could be found in many "mandatory" plans. Thus such plans may provide that an employee who reaches the stated age can request continued work and will be continued if the employer agrees: it might be said that an employee who does not make any request for continuance is opting to retire. Nevertheless this feature has not been regarded as depriving a plan of its mandatory character for unemployment benefit purposes. See *Texaco Inc.* v. *Texas Employment Comm'n*, 508 S.W.2d 957, 958 (Tex. Civ. App. 1974). Cf. *Duval Corp.* v. *Employment Security Comm'n, supra* at 448.

[13] We venture to say that even if the provision as to retirement programs did not appear in the second paragraph of § 25(e), and "voluntarily" was the criterion, a strong case could be made that an employee leaving under the M.I.T. retirement program as did the petitioner was not leaving "voluntarily." This would need only a realistic approach to that concept. Cf. n.9 above.

[14] Thus where a plan gives the employee, not the employer, the right to continue in the employment well beyond a "normal" or "early" retirement date, the plan cannot well be said to "require" retirement until a compulsory date is finally reached. See *In re Fisher*, 36 N.Y.2d 146 (1975); *United States Steel Corp.* v. *Pennsylvania Unemployment Compensation Bd. of Review*, 18 Pa. Commw. Ct. 71 (1975). The Report, note 11 above, at 48, observes a trend toward optional early retirements.

how far it might tend toward a finding that a retirement was not required, that the employee chose to retire well before a fixed date as the result of inducements of special benefits or advantages.[15] Cases of these types might be thought "optional" retirements according to customary speech. The distinction may become one of degree; but the present case in our view would fall at a point on such a continuum where unemployment benefits clearly should not be withheld.[16]

If there remains room for doubt, it should be resolved in favor of the plaintiff in light of the expressed policy of liberal construction of the law in aid of its purpose to lighten the burden falling on the unemployed worker. G. L. c. 151A, § 74. We add: First, for elderly workers disqualification might be particularly cruel because they would often have peculiar difficulty obtaining fresh employment which (as indicated above) would be a condition of their reinstating themselves as possible recipients of unemployment benefits. Second, the agency's position would open up an avenue of purposeful circumvention of the law through introduction of minimal employee choices in retirement plans, especially those plans formulated unilaterally without employee representation or participation.

This analysis makes it unnecessary to pursue the plaintiff's contention that the record shows (or suggests sufficiently, so as to justify a remand to permit the plaintiff to show) that he reasonably relied on the employer's representations, express or implied, that choice of December retirement would involve no detriment, and the employer should be held estopped accordingly.

---

[15] See In re Astrom, 362 So. 2d 312 (Fla. Dist. Ct. App. 1978). Cf. Vidrine v. Louisiana Div. of Employment Security, 326 So. 2d 385 (La. App. 1976). Compare In re Fisher, 36 N.Y.2d 146, 153 (1975), with McGraw v. Director of Postal Data Center, 319 So. 2d 797, 798 (La. App. 1975).

[16] As to the formula for reducing unemployment benefits in relation to pension moneys received by the employee, see G. L. c. 151A, § 29(d).

We reverse the judgment of the District Court. The decision of the agency's review examiner should be set aside and the defendant directed to grant plaintiff's claim for benefits.

*So ordered.*