# DECISIONS

## OF THE

## APPEALS COURT

### OF

## MASSACHUSETTS

---

STATE STREET BANK & TRUST CO. *vs*. DEPUTY DIRECTOR OF
THE DIVISION OF EMPLOYMENT AND TRAINING & another[1]
(and a companion case[2]).

Nos. 04-P-1522 & 04-P-1663.

Norfolk. June 8, 2005. - April 6, 2006.

Present: BECK, McHUGH, & KAFKER, JJ.

*Employment Security,* Voluntary unemployment.

Discussion to the effect that the Supreme Judicial Court's decision in *Morillo*
v. *Director of the Div. of Employment Sec.*, 394 Mass. 765 (1985), did not
overrule its decision four years earlier in *White* v. *Director of the Div. of
Employment Sec.*, 382 Mass. 596 (1981), which held that an employee
who accepts an employer's incentive to depart from his employment with
a reasonable belief that his employment would be terminated if he declined
the incentive is entitled to unemployment compensation benefits as an
involuntarily separated individual under G. L. c. 151A, § 25(*e*)(1). [6-9]
Substantial evidence supported the determinations of the board of review of the

---

[1]Charley Eustache.

[2]State Street Bank & Trust Co. *vs*. Deputy Director of the Division of
Employment and Training & another.

Division of Employment and Training that two employees who terminated their employment voluntarily in response to an employer's incentive in the form of a voluntary separation package (VSP), after concluding on the basis of facts, observations, talk among fellow employees, and whatever other rational aids to decision-making available to them, as well as inferences and judgments, that they were likely to suffer involuntary separation if they did not accept the VSP, departed voluntarily for good cause attributable to the employer within the meaning of G. L. c. 151A, § 25(*e*)(1), governing unemployment compensation. [9-12]

CIVIL ACTION commenced in the Quincy Division of the District Court Department on January 20, 2004.

The case was heard by *Mark S. Coven*, J.

CIVIL ACTION commenced in the Quincy Division of the District Court Department on February 20, 2004.

The case was heard by *Mark S. Coven*, J.

*Jean S. Stripinis* for Charley Eustache.

*Thomas C. Fallon* for the plaintiff.

*Amy L. Hanson* for Rebecca Drucker.

McHUGH, J. In April, 2003, State Street Bank & Trust Co. (State Street), seeking to reduce its workforce without involuntary terminations, began to offer its domestic employees what it called a "Voluntary Separation Package" (VSP) containing incentives for employees who agreed to leave its employ. Charley Eustache and Rebecca Drucker, who were then employed by State Street, accepted a VSP and terminated their employment. They then applied for unemployment compensation benefits. State Street objected, contending that their voluntary departure made them ineligible for benefits. Administrative proceedings produced an award of benefits to Eustache and Drucker. State Street appealed to the District Court where a judge ordered entry of judgment vacating those awards. Eustache and Drucker took separate appeals to this court. We reverse.

The facts common to both appeals are as follows. On April 10, 2003, State Street sent its approximately 13,000 United States employees an electronic mail memorandum (e-mail) informing them that the company had to reduce annual expenses by $125 million and was embarking on an "aggressive" expense

reduction program to do so. As part of the program, the e-mail said that the company planned to reduce its workforce by 1,800 employees.

State Street's e-mail informed the employees that the workforce reduction would occur in two phases. In phase one, all domestic employees who had been employed for a year or more would be offered a VSP, which would include enhanced retirement benefits and cash incentives, all of which exceeded the benefits State Street provided to employees who were involuntarily terminated without cause. The VSP program would begin on May 1, 2003, and would remain open for forty-five days. The e-mail stated that precise benefits available to each employee under the VSP would be explained in a letter mailed to the employee at his or her home. The initial e-mail also stated that State Street reserved the right to exclude any employees from participation in the plan "on the basis of business needs or other considerations." Finally, State Street's e-mail stated that phase two would consist of involuntary terminations of employees State Street selected from its worldwide workforce of 20,000 people. The involuntary terminations would begin at the end of the forty-five days if 1,800 domestic employees had not voluntarily departed.

On May 1, 2003, State Street sent each employee a communication that laid out the specific VSP benefits available to him or her. In that communication, State Street said that those who accepted a VSP would have seven days to rescind their acceptance, after which the acceptance would be final. State Street's communication also included a series of questions and answers, one of which said that each employee would have to "check with [his or her] state's local unemployment insurance office to determine if [he or she] would be eligible for unemployment insurance benefits [after electing] the VSP."

As part of its preparation for the reductions, State Street instructed its managers not to provide subordinates with opinions about whether to take a VSP. Managers were also instructed not to offer any suggestions or opinions regarding criteria that State Street would use for involuntary terminations if the VSP failed to produce the needed workforce reduction. During the forty-five day period the VSP was open, State Street

gave employees no information about the extent to which the program was working or how many people had accepted the separation packages. In fact, 3,100 State Street employees accepted a VSP and no involuntary terminations were necessary.

Although sharing those common facts, the unemployment compensation claims filed by Eustache and Drucker are also based on facts unique to them. Eustache had been employed by State Street as a full-time portfolio accountant for fifteen years when the VSP was announced. He was just shy of fifty years old and worked as a senior member of a busy group. Before State Street's announcement of the VSP, Eustache had applied for a promotion. His then most recent evaluation placed his job performance at "above the standard" and his supervisor recommended him for the promotion. Nevertheless, he did not receive it. When he asked his supervisor for an explanation, the supervisor told him that he could think of no reason why he had not been chosen. In a separate conversation, a different supervisor told Eustache that he was considering a VSP for himself, although he offered no insights into his thinking and offered no opinion about whether Eustache should do so.

Eustache had heard rumors that, if involuntary separations became necessary, those who were most senior would be the first to go because they had the higher salaries. Although those rumors were never confirmed or substantiated, Eustache believed that he would be laid off if he did not accept the VSP.

On May 26, 2003, Eustache accepted the VSP and received benefits valued at $19,305.41 for doing so. He was the only member of his group to accept a VSP, and his last day of work was June 27, 2003. State Street filled Eustache's position with an existing employee and later hired two additional people for Eustache's group.

Eustache applied for unemployment benefits in August, 2003. His application was approved in September. State Street appealed the determination administratively, see G. L. c. 151A, §§ 39-41, but the award of benefits was upheld by the board of review of the Division of Employment and Training (board) on the ground that Eustache "accepted the VSP because he reasonably believed that he would be laid off if he did not. Such leaving is considered voluntary with good cause attributable to"

State Street. See G. L. c. 151A, § 25(*e*)(1). State Street then appealed to the District Court, see G. L. c. 151A, § 42, where a judge reversed the decision of the board.

The other defendant, Rebecca Drucker, was employed as a graphic designer in twelve-person unit known as the design group. The design group was a part of State Street's marketing and communications department, which itself was a component of the worldwide marketing and communications division. State Street had consistently rated Drucker as a "three" on a scale of five in its annual evaluations, a rating that meant she met State Street's expectations for work performance.

In the year 2000 and again in October, 2002, the worldwide marketing and communications division had experienced force reductions. Eighteen members of the division were terminated in 2000 as a result of consolidations. The record does not reveal how many were terminated in 2002, but none came from Drucker's department.

In May, 2003, Drucker's supervisor, a State Street vice-president, left State Street abruptly, without explanation and before the VSP program terminated. His departure generated employee concern about the design group's future.

Drucker believed that employees in the design group were likely targets for involuntary terminations if the VSP program did not meet State Street's goals because that group did not directly produce revenue. She agreed, however, that her feelings in that regard were "speculative." She also believed that her group's workload would likely increase after the VSP ended and each division was able to review its new budget.

Along with three other members of the design group, Drucker elected to take a VSP. Her VSP contained thirty-two weeks of pay and benefits instead of the twenty-four weeks she would have received had she been separated involuntarily. Her last day of work was June 27, 2003. She filed for unemployment benefits in August, 2003, and her application was approved in September of that year. Benefits were awarded on the grounds that Drucker had left State Street's employ "for good cause attributable to" State Street "or for urgent, compelling, and necessitous reasons." See G. L. c. 151A, § 25(*e*)(1). Again, State Street appealed administratively, and again, the appeal was denied. As it

had done in Eustache's case, State Street appealed to the District Court, where a judge reversed the decision of the board.

In both cases, the District Court judge concluded that the administrative records did not contain "substantial evidence," see G. L. c. 30A, § 14(7), that either Eustache or Drucker had a reasonable fear of imminent involuntary termination at the time they accepted the VSP. Relying on *White* v. *Director of the Div. of Employment Sec.*, 382 Mass. 596, 598-599 (1981), the judge further concluded that, absent a reasonable fear of imminent termination, G. L. c. 151A, § 25(*e*)(1), prohibited the award of unemployment compensation benefits to either employee. In their appeal from the District Court decisions, Drucker and Eustache tender two primary questions for resolution. The first is whether *White* provides the appropriate rule of decision for these cases or whether *White* was effectively overruled by the Supreme Judicial Court's later decision in *Morillo* v. *Director or the Div. of Employment Sec.*, 394 Mass. 765 (1985), a case they claim stands for the proposition that any employee who leaves voluntarily after an employer announces a force reduction plan is entitled to unemployment compensation benefits. The second is whether, if *White* does provide the appropriate rule, the administrative records show that either Eustache or Drucker, or both, established by substantial and credible evidence the existence of a reasonable belief that failure to accept the VSP would promptly lead to their involuntary termination.[3]

The context for both questions is, of course, the governing

---

[3]State Street also tenders a procedural question, namely whether Drucker and Eustache's failure to comply with Dist./Mun.Cts. Supp.R.Civ.P. 140 requires dismissal of the appeals. Rule 140, entitled "Appeals from District Courts in Employment Security Cases under G. L. c. 151A, § 42," requires a party taking an appeal from a District Court decision to file and settle a draft report and contains the procedure for doing so. The rule appears to implement the provision of an older form of c. 151A, § 42, which required the District Court and the Boston Municipal Court to promulgate rules for establishing reports in connection with appeals in employment security cases and required the appellant to file a draft report within five days of claiming an appeal from a judicial decision. See generally *McGowan* v. *Director of the Div. of Employment Sec.*, 388 Mass. 1003 (1983). The entire report provision, however, was eliminated from the statute when it was amended in 1990. See St. 1990, c. 154, § 30. As so amended, the statute provides that "[n]otice of appeal shall be filed in the office of the clerk of the district court within thirty days after entry of the judgment by the clerk. The completion of such appeal shall

statute, G. L. c. 151A, § 25(*e*)(1). Section 25(*e*) is a component of the Commonwealth's unemployment compensation laws, "[t]he broad[] purpose of [which] is to provide temporary relief for those who are realistically compelled to leave work through no 'fault' of their own, whatever the source of the compulsion, personal or employer-initiated." *Raytheon Co.* v. *Director of the Div. of Employment Sec.*, 364 Mass. 593, 596 (1974). To that end, the relevant provisions of § 25(*e*) describe the circumstances under which an employee who leaves employment without being discharged can nevertheless qualify for unemployment compensation benefits. In pertinent part, those provisions, as amended through St. 1992, c. 26, § 19, provide as follows:

> "[N]o benefits shall be paid to an individual under this chapter for . . . the period of unemployment next ensuing and until the individual has had at least eight weeks of work and in each of said weeks has earned an amount equivalent to or in excess of the individual's weekly benefit amount after the individual has left work (1) voluntarily unless the employee establishes by substantial and credible evidence that he had good cause for leaving attributable to the employing unit or its agent. . . . An individual shall not be disqualified from receiving benefits under the provisions of this subsection, if such individual establishes to the satisfaction of the commissioner that his reasons for leaving were for such an urgent, compelling and necessitous nature as to make his separation involuntary."

In other words, an employee who has not been discharged is eligible for benefits if he or she can demonstrate that the departure from work was triggered by reasons so "urgent, compelling and necessitous" that the departure was in fact involuntary, see *Uvello* v. *Director of the Div. of Employment Sec.*, 396 Mass. 812, 815 (1986), or, even if the departure was voluntary, the employee demonstrates that he or she left for good cause attributable to the

be made in accordance with the Massachusetts Rules of Appellate Procedure." The Massachusetts Rules of Appellate Procedure do not require a draft report. When, as in this case, a procedural rule is inconsistent with a statute, the statute prevails. See *Garrett* v. *Director of the Div. of Employment Sec.*, 394 Mass. 417, 419-420 (1985). Consequently, Drucker and Eustache were not required to file a draft report.

employer. See *LeBlanc* v. *Director of the Div. of Employment Sec.*, 398 Mass. 1010 (1986); *Potris* v. *Commissioner of the Dept. of Employment & Training*, 42 Mass. App. Ct. 735, 738 (1997). See generally *Crane* v. *Commissioner of the Dept. of Employment & Training*, 414 Mass. 658, 660-661 (1993).

Against that backdrop, we turn to the first of the questions Eustache and Drucker have posed, namely, whether *Morillo* v. *Director of the Div. of Employment Sec.*, 394 Mass. 765 (1985) (*Morillo*), overruled *White* v. *Director of the Div. of Employment Sec.*, 382 Mass. 596 (1981) (*White*), and established a rule that any employee who volunteers to participate in an employer's force reduction plan is entitled to unemployment benefits. We think not.

In *White*, *supra* at 597, the employer offered to pay White a bonus of $3,000 if he would retire before January 1, 1979. White had limited seniority and had heard rumors of impending layoffs, so he accepted the employer's offer and retired on December 30, 1978. *Ibid.* There was evidence in the record that he did so because "[h]e knew that there would be layoffs based on seniority. He thought he would be the second person laid off, based on seniority, and that close to forty people would have to go. He took the incentive rather than accepting a layoff." *Id.* at 598. It turned out, however, that White would not have been laid off or otherwise forced to leave if he had not departed voluntarily. *Id.* at 597.

After retiring, White applied for unemployment compensation. *Ibid.* His application was denied at the administrative level, but he prevailed on an appeal to the Boston Municipal Court, where the judge made findings that his departure had not been truly voluntary because he had acted under a reasonable belief that he would be terminated if he did not accept the employer's offer. *Id.* at 598-599. The Supreme Judicial Court embraced the judge's reasoning, holding that if White reasonably believed that his employment would "soon be terminated if he worked beyond December 31, 1978," his departure "could not fairly be regarded as voluntary" and that he was entitled to unemployment compensation benefits. *Id.* at 597-598.[4]

---

[4]The court nevertheless returned the case to the administrative agency because, although there was evidence in the record of the employee's reasonable fear of imminent discharge, the agency had made no factual findings that the employee actually harbored those fears. *Id.* at 599.

Four years later, the court decided *Morillo, supra.* There, the employer had offered no incentives for voluntary departures. *Id.* at 765. Instead, the employer simply announced that twelve people were to be laid off. *Ibid.* Dissatisfied with the safety of workplace machinery, Morillo offered to be one of the twelve, and the employer accepted. *Id.* at 765-766. Morillo left the employment, but later, after administrative proceedings, was denied unemployment benefits on ground that he had departed voluntarily. *Id.* at 766. Without citing *White*, the Supreme Judicial Court reversed the denial.

Three considerations drove the reversal. First was the explicit statutory mandate "to construe the unemployment security law 'liberally in aid of its purpose, which purpose is to lighten the burden which now falls on the unemployed worker and his family.' " *Morillo, supra* at 766, quoting from G. L. c. 151A, § 74. The second was that allowing Morillo to collect benefits would have an economically neutral impact on the employer because "his [employment security] account[5] [would] be charged regardless of the identity of employees who [were] laid off." *Morillo, supra.* Finally, Morillo's departure was not truly "voluntary," in the court's view, because the employer initiated the layoff plan and allowed Morillo to participate in it. *Ibid.*

We think that the rule in *Morillo, supra* at 765, is reserved for situations in which an employer announces that layoffs are to occur and accepts volunteers without offering them any incentives. The absence of incentives was a key difference between *White* and *Morillo*, as was the absence of any discernible economic impact on Morillo's employer flowing from the precise identity of the twelve employees who were terminated. Moreover, we think it highly unlikely that the court would have intended in *Morillo* to overrule what was then its four-year-old decision in *White* without even mentioning that case.

*White*, therefore, survived *Morillo*, and we think it is virtually impossible to distinguish the two cases currently before us from *White*. In all three cases, the employer offered incentives for departure. In all three cases, the employee accepted. In *White*, 382 Mass. at 597-598, it was clear that the employee would not

[5]See G. L. c. 151A, § 14(*k*).

have been terminated if he had refused the employer's incentive, but the court held that he was nevertheless entitled to benefits if he established that he had a reasonable fear of prompt termination. Here, given the success of the VSP program, it turns out that neither Eustache nor Drucker would have been terminated, but the review examiner found that both had a reasonable fear of termination if they did not accept. There was substantial evidence, see *Lycurgus* v. *Director of the Div. of Employment Sec.*, 391 Mass. 623, 626-627 (1984); *Potris* v. *Commissioner of the Dept. of Employment & Training*, 42 Mass. App. Ct. at 737-738, that both Eustache's and Drucker's beliefs were objectively reasonable, see *Fergione* v. *Director of the Div. of Employment Sec.*, 396 Mass. 281, 284 (1985); Eustache's because he failed without explanation to receive a promotion for which his supervisor had recommended him and was among the higher salaried employees in his work group, and Drucker's because her group was not revenue producing and her supervisor left without explanation in the middle of the VSP program, raising doubts about her group's viability. "If there remains room for doubt, it should be resolved in favor of the [employee] in light of the expressed policy of liberal construction of the law in aid of its purpose to lighten the burden falling on the unemployed worker. G. L. c. 151A, § 74." *O'Reilly* v. *Director of the Div. of Employment Sec.*, 377 Mass. 840, 846 (1979).

As noted above, *White, supra,* articulates a standard for determining when an employee terminated his employment involuntarily even though he has not been fired. As also noted, however, G. L. c. 151A, § 25(*e*)(1), provides that an employee who terminates employment voluntarily is entitled to benefits if his departure was for "good cause" "attributable to the employ[er]." Even if Eustache or Drucker did not terminate their employment "involuntarily" within the meaning of *White,* we think the record contains substantial evidence to support the review examiner's conclusion that they did so "for good cause attributable to" State Street.

State Street's announcement of a layoff plan containing voluntary and involuntary components inevitably required each employee to make judgments about the costs and benefits of

voluntary departure against the likelihood as well as the costs and benefits of involuntary separation. The manner in which State Street executed its plan, however, substantially hindered the ability of employees to make a realistic assessment of the likelihood that they would be involuntarily separated. Although State Street announced that its reduction goal was nine percent of its global workforce, no employee could safely conclude that he or she had only a nine percent chance of involuntary separation. State Street did not announce that involuntary separations would proceed randomly or disclose the nonrandom criteria it would use to implement them. Each employee or group of employees, therefore, was left to speculate about the criteria State Street would use without any insight into State Street's actual plans and without knowing whether their personal experience, knowledge, seniority, wage level, or performance ratings would have any impact on State Street's decision. Moreover, because it elected not to tell employees how the VSP was proceeding, employees were unable to determine whether the program's progress was increasing or decreasing the likelihood that they would be involuntarily terminated. By constructing the VSP the way it did, then, State Street created an environment in which all employees were required to guess, speculate, and cobble together as best they could information on which to base a decision as to whether they would be involuntarily separated.[6]

In light of State Street's approach, we think that Drucker and Eustache, who left State Street's employ after concluding on the basis of facts, observations, talk among fellow employees, and whatever other rational aids to decision-making were available to them, inferences and judgments that they were likely to go involuntarily if they did not accept the VSP, departed voluntarily for good cause attributable to State Street within the meaning of G. L. c. 151A, § 25(*e*)(1). By creating an environment in which all employees had to speculate on the likelihood that they would be able to avoid involuntary separation, State Street gave employees who reasonably feared involuntary separation good

---

[6]That is not to criticize the manner in which State Street proceeded, for one can think of many sound reasons for doing so. It is simply to note one set of consequences of State Street's choice.

cause to adopt the mitigating strategy of accepting the VSP and leaving.

The judgments of the District Court are vacated, and the cases are remanded for entry of judgments affirming the decisions of the board of review.

*So ordered.*