PIUS AWUAH & others[1] vs. COVERALL NORTH AMERICA, INC.

Suffolk. May 3, 2011. - August 31, 2011.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, GANTS, & DUFFLY, JJ.

*Labor,* Wages. *Massachusetts Wage Act. Contract,* Employment. *Workers' Compensation Act,* Premium, Costs. *Statute,* Construction. *Public Policy. Words,* "Special contracts," "Damages incurred," "Franchise fees."

This court concluded that under the Massachusetts Wage Act (act), a franchisor may not lawfully use "customer accounts-receivable" financing to pay a franchisee who is characterized as an employee under the act; further, this court concluded that an employer could not lawfully withhold wages to an employee even if the employer and the employee have agreed that such wages are not earned until a customer remits payment. [490-493]

This court concluded that under the Massachusetts Wage Act (act), the damages incurred for which a misclassified worker can seek recompense under the act include costs that an employer statutorily must bear, in particular, workers' compensation insurance; further, this court concluded that an employee and his employer could not lawfully agree that the employee will pay some or all of the cost of workers' compensation or other insurance procured to alleviate the liability of the employer. [493-497]

This court concluded that fees such as "franchise fees," i.e., fees that an employee agrees to pay an employer in order to enter into a direct employment relationship with the employer, constitute special contracts that, in substance, operate to require employees to buy their jobs from employers and, in that respect, violate public policy. [497-499]

CERTIFICATION of questions of law to the Supreme Judicial Court by the United States District Court for the District of Massachusetts.

*Shannon Liss-Riordan (Hillary Schwab* with her) for the plaintiffs.

*Michael D. Vhay (Norman M. Leon,* of Illinois, & *Matthew Iverson* with him) for the defendant.

The following submitted briefs for amici curiae:

---

[1]Denisse Pineda, Jai Prem, Richard Barrientos, Anthony Graffeo, Manuel DaSilva, Aldivar Brandao, Benecira Cavalcante, and Geraldo Correia. We note that some of the plaintiffs' claims have been resolved in part or in whole.

*Catherine Ruckelshaus*, of New York, & *Audrey R. Richardson* for Brazilian Immigrant Center & others.

*Eric H. Karp, Doris M. Fournier, Robert K. Sawyer, Jr., & Adam N. Lewis* for International Franchise Association & others.

*Martha Coakley*, Attorney General, & *Karla E. Zarbo*, Assistant Attorney General, for the Commonwealth.

Botsford, J. A judge of the United States District Court for the District of Massachusetts ruled in a case filed in that court that the defendant, Coverall North America, Inc., misclassified as independent contractors those plaintiffs who are Massachusetts residents. He has certified to this court questions related to calculation of damages for one such plaintiff, Anthony Graffeo. The certified questions relate to whether, under Massachusetts law, an employer may use a system of customer accounts receivable financing to pay its employee at the time the customer pays the employer for the employee's work rather than when the work is performed; and whether, under the Massachusetts Wage Act, G. L. c. 149, §§ 148, 150 (Wage Act), an employer and an employee may agree that the employee will pay the cost of workers' compensation and other work-related insurance coverage. We conclude that the accounts receivable financing system at issue improperly defers payment of the employee's earned wages, and that an employer may not deduct the insurance costs from an employee's earned wages. In response to the judge's invitation to provide additional guidance, we also address the question whether Coverall may deduct "franchise fees" from such wages, and conclude that the Wage Act forbids the deductions.[2]

1. *Background*. The plaintiffs are individuals who have entered into contracts, called "janitorial franchise agreements," with Coverall for the provision of commercial janitorial services to

---

[2]We acknowledge the amicus brief of the Attorney General on behalf of the Commonwealth; the amicus brief of the Brazilian Immigrant Center, Brazilian Women's Group, Centro Presente, Chelsea Collaborative, Chinese Progressive Association, Massachusetts Coalition for Occupational Safety and Health, Massachusetts Immigrant and Refugee Advocacy Coalition, Massachusetts Jobs with Justice, Metrowest Worker Center, Project Voice/American Friends Service Committee, and National Employment Law Project; and the amicus brief of the International Franchise Association, Friendly's Restaurants Franchise LLC, and Fantastic Sams Franchise Corporation.

third-party customers. See *Awuah* v. *Coverall N. Am., Inc.*, 707 F. Supp. 2d 80, 81 (D. Mass.) (*Awuah I*), *S.C.*, 740 F. Supp. 2d 240, 241 (D. Mass. 2010) (*Awuah II*). They commenced this case in the Federal District Court for the District of Massachusetts in 2007 as a class action, alleging that Coverall misclassified the named plaintiffs and other similarly situated individuals as independent contractors. See *Awuah I*, *supra* at 81; *Awuah II*, *supra* at 241. On March 23, 2010, in *Awuah I*, the judge ruled that the Massachusetts "franchisees" of Coverall were misclassified as independent contractors under the Commonwealth's misclassification statute, G. L. c. 149, § 148B, and accordingly were "employees."[3,4] See *Awuah I*, *supra* at 84-85. After further proceedings not relevant here, the judge ruled on the remaining parties' cross motions for summary judgment regarding damages suffered by one misclassified worker, the plaintiff Graffeo.[5] *Awuah II*, *supra* at 241.

In *Awuah II*, *supra* at 242-243, the judge addressed several types of costs and fees, the substance of which are described in more detail below. He concluded that Coverall properly could deduct from payments to Graffeo certain amounts related to

[3]Although the judge refers to the plaintiffs as "franchise owners" or "franchisees," he found the Massachusetts plaintiffs are "employees" for purposes of G. L. c. 149, § 148B. See *Awuah* v. *Coverall N. Am., Inc.*, 707 F. Supp. 2d 80, 84-85 (D. Mass.) (*Awuah I*), *S.C.*, 740 F. Supp. 2d 240 (D. Mass. 2010) (*Awuah II*). Coverall concedes the plaintiffs are employees for the purpose of the proceeding before us, and we refer to them as such in this opinion. Our answers to the certified questions are premised on the plaintiffs' agreed-on employee status; the answers have no application to properly classified independent contractors operating under franchise agreements. See, e.g., *Boulanger* v. *Dunkin' Donuts Inc.*, 442 Mass. 635, 635-636 (2004) (holding covenants in franchise agreement were enforceable).

[4]In a separate case, based on somewhat different facts and reasoning, this court concluded that an individual "franchisee," who had contracted with Coverall, was misclassified as an independent contractor, and that Coverall was required under G. L. c. 151A to pay contributions to the unemployment compensation based on the individual's reported earnings during her employment by Coverall. *Coverall N. Am., Inc.* v. *Commissioner of the Div. of Unemployment Assistance*, 447 Mass. 852, 856-857, 859 (2006).

[5]Anthony Graffeo was added as a plaintiff in the fourth amended complaint, filed on July 9, 2010. The judge denied class certification without prejudice to a later certification of a class raising the Massachusetts misclassification claims. *Awuah II*, 740 F. Supp. 2d at 241.

"franchise fees,"[6] royalty and management fees, and the cost of supplies and equipment, so long as Graffeo was paid at least the minimum wage. *Id.* at 243. However, the judge also concluded that Coverall was statutorily mandated as the employer to provide and pay for workers' compensation insurance; to the extent Graffeo paid for insurance premiums that Coverall was required to pay, Graffeo was injured by his misclassification and could recover the premium costs as "damages incurred" under the enforcement section of the Wage Act, G. L. c. 149, § 150 (§ 150). *Id.* at 241-243. The judge further determined that Coverall's "accounts-receivable financing" protocol violated another provision of the Wage Act, G. L. c. 149, § 148 (§ 148), requiring that employers pay employees within a week of the weekly or biweekly pay period during which wages were earned. *Id.* at 244-245. The judge ruled that, although Coverall eventually repaid to Graffeo the "chargebacks" it collected from him to offset customers' unpaid bills under this protocol, Graffeo is owed interest on the chargebacks for the period of time they were outstanding. *Id.* at 243 n.2, 245. Finally, the judge concluded that the resolution of Graffeo's claims presented issues of Massachusetts statutory law, and, accordingly, stated his intent to certify questions to this court pursuant to S.J.C. Rule 1:03, as appearing in 382 Mass. 700 (1981). *Id.* at 245.

An order of certification followed. It poses four questions:

> "1. Under Massachusetts law, may a franchisor lawfully use customer accounts-receivable financing to pay a franchisee who is characterized as an employee under [G. L. c. 149, § 148B]?

> "2. Under Massachusetts law, do the 'damages incurred' for which a misclassified worker can seek recompense under [G. L. c. 149, § 150,] include costs that an employer statutorily must bear?

> "3. Under Massachusetts law, may an employer lawfully withhold wages to an employee if the employer and employee agree that such wages are not earned until a customer remits payment?

---

[6]The plaintiffs assert that in a related arbitration decision, the District Court judge reached a contrary conclusion as to these same "franchise fees."

"4. Under Massachusetts law, may an employee and his employer lawfully agree that the employee will pay some or all of the cost of workers' compensation or other insurance coverage procured to alleviate the liability of the employer?"[7]

We summarize the facts of the case from the order of certification and the record before us. As previously stated, Coverall contracts in "franchise agreements" with individuals for the provision of commercial janitorial services to third-party customers. *Awuah I, supra* at 81. The contracts require the contracting employees to complete mandatory training programs and wear approved uniforms and identification badges. *Id.* at 82. Under the contracts, Coverall performs all billing and collection services, and remits payments to employees after deducting certain fees. *Id.* Graffeo, a Massachusetts resident, signed one such contract in 1995. He hired no employees, but instead provided cleaning services directly.

The contract between Coverall and Graffeo provided that Graffeo would pay Coverall fees in several categories; five of them are at issue between the parties.[8] First, to secure an initial package of customer accounts, the contract required Graffeo to pay Coverall an initial "franchise fee" of $3,250, of which $1,700 was payable in cash on execution of the contract; the balance, plus interest, was to be paid in instalments over the following twenty-four months. The agreement also gave Graffeo the option of securing additional customer accounts by paying additional business fees to Coverall.[9]

Second, the contract required Graffeo to pay monthly royalty and management fees equal to five per cent and ten per cent,

---

[7]The judge also stated that he "welcome[d] the advice of the Supreme Judicial Court of Massachusetts on any other questions of Massachusetts law deemed material to this case."

[8]The certified questions, however, do not concern all five of the disputed fees, and we decline the plaintiffs' invitation to consider all of them. See note 20, *infra.*

[9]In one of the certified questions before us, the judge states that Graffeo identified the "franchise fees" as one of the categories of disputed deductions. We understand this category to encompass both the "franchise fee," for an initial volume of customer accounts, and the "sales and marketing fee," for additional business, as those terms are defined in the contract between Coverall and Graffeo. The parties agree Graffeo paid an initial "franchise fee" of $3,250, and, between 2004 and 2010, additional business fees of approximately $1,320.

respectively, for a total of fifteen per cent, of the amount Coverall billed customers assigned to Graffeo.[10]

Third, the contract made Graffeo responsible for all losses, damages, or personal injuries arising out of his janitorial services, and required him to maintain janitorial bonding, workers' compensation insurance for himself and any employees, unemployment insurance as required by law, and comprehensive liability insurance.[11] All insurance policies were to name Coverall as an additional insured. The contract gave Graffeo the option of purchasing general liability insurance and bonding through Coverall and paying Coverall for the premiums and certain surcharges. He accepted this option.[12] In January, 2004, Graffeo also opted into Coverall's "franchise owner job related accident program" (FOJ program), as Coverall required him to do unless he could demonstrate he had on-the-job accident insurance or workers' compensation insurance.[13]

Fourth, the contract required Graffeo to provide replacement supplies and equipment. Although he purchased supplies primarily from third parties, on at least one occasion, Graffeo purchased supplies from Coverall and Coverall deducted the cost from the amounts it paid him.[14]

---

[10]The parties agree that the management fees relate to Coverall's management of client accounts, including customer billing and customer relations services. Coverall describes the royalty fees as the charge for a license to use Coverall's "marks," including its trade name, service mark, and "system" of business methods. Graffeo asserts he has paid approximately $6,920 in royalty and management fees since July, 2004.

[11]As explained in an affidavit that Coverall filed in the Federal District Court, since 2003, Coverall's workers' compensation insurance has included a rider for Coverall's "franchisees," should they be deemed to be employees or otherwise to have a relationship to Coverall that obligates Coverall to provide them with workers' compensation benefits. Coverall in this sense apparently carries workers' compensation insurance for all its workers, without regard to whether it deems them franchisees or employees.

[12]Graffeo asserts he has paid approximately $5,416 to Coverall for insurance since July, 2004.

[13]Coverall describes the "franchise owner job related accident program" (FOJ program) as "similar to, but not the same as, workers' compensation."

[14]The contract stated that Coverall would provide an initial set of supplies and equipment; thereafter, Graffeo was responsible under the contract for replacing supplies and equipment as necessary to service customer accounts. Graffeo states he has paid at least $62.47 directly to Coverall for cleaning fluid since July, 2004. Coverall identifies the amount as $72.46.

Fifth and finally, the contract provided for "accounts receivable financing" whereby Coverall would pay Graffeo "interest-free advances" for amounts billed to, but not yet collected from, customers. If customers failed to pay Coverall within ninety days of the date the payment was due, the contract required Graffeo to "repay" Coverall the "advance." These "charge-backs" are the final contested category of payments Graffeo made to Coverall.

*2. Discussion.* The Wage Act requires "prompt and full payment of wages due." *Camara* v. *Attorney Gen.*, 458 Mass. 756, 759 (2011) (*Camara*). Section 148 of the Wage Act provides in pertinent part:

> "Every person having employees in his service shall pay weekly or bi-weekly each such employee the wages earned by him to within six days of the termination of the pay period during which the wages were earned if employed for five or six days in a calendar week . . . . No person shall by a special contract with an employee or by any other means exempt himself from this section or from [§ 150] . . . ."

G. L. c. 149, § 148. Section 150 allows an employee claiming to be aggrieved by a violation of § 148 to prosecute "a civil action for injunctive relief, *for any damages incurred,* and for any lost wages and other benefits" (emphasis added). G. L. c. 149, § 150. An employee who prevails in such an action shall be awarded costs and reasonable attorney's fees, and may be awarded treble damages.[15] *Id.*, as amended through St. 2005, c. 99, § 2. With limited exceptions, employers may not withhold pay from their employees, a point expressed in § 150 by limiting an employer's defenses:

> "On the trial no defence for failure to pay as required,

[15]Effective July 12, 2008, § 150 has been amended to provide that an employee who prevails in an action brought under § 148 shall be awarded treble damages for lost wages and other benefits. See G. L. c. 149, § 150 (§ 150), as amended through St. 2008, c. 80, § 5. However, because this case was filed in 2007, the relevant version of the statute is the prior version, under which the award of treble damages was permissible but not mandatory. See § 150, as amended through St. 2005, c. 99, § 2. See also *Rosnov* v. *Molloy*, *ante* 474 (2011).

other than the attachment of such wages by trustee process or a valid assignment thereof or a valid set-off against the same, or the absence of the employee from his regular place of labor at the time of payment, or an actual tender to such employee at the time of payment of the wages so earned by him, shall be valid."

G. L. c. 149, § 150.

a. *Questions One and Three.* Questions One and Three are closely related, and we answer them together. The judge's first question asks: "Under Massachusetts law, may a franchisor lawfully use customer accounts-receivable financing[16] to pay a franchisee who is characterized as an employee under [G. L. c. 149, § 148B]?" The third question asks: "Under Massachusetts law, may an employer lawfully withhold wages to an employee if the employer and employee agree that such wages are not earned until a customer remits payment?" To both questions, we answer, "No."

Coverall argues that no compensation is due to its workers until all "contingencies," including customer payment, have been satisfied. It defends accounts receivable financing as a benefit to workers, in that advances on compensation not yet due allows them to access funds more quickly when customers are late (but not too late[17]) in paying their bills. It argues also

---

[16]Although the order of certification does not define "customer accounts-receivable financing," in his September 28, 2010, ruling on the parties' cross motions for summary judgment, the judge described accounts receivable financing by quoting the parties' contract:

> "*Accounts Receivable Financing.* Interest-free advances by Franchisor to Franchisee of an amount that has been billed to, but not collected from customer accounts of the Franchisee are available. Advances will be made no earlier than the twenty-seventh day following the month the services were rendered. Advances attributable to billings for any one customer shall not exceed an amount equal to billings for sixty (60) days and shall not remain outstanding for a period exceeding ninety (90) days from the date on which the amount of the billing was due from the customer. If advances remain uncollected from the customer at the end of said ninety (90) days, Franchisee shall repay Franchisor the amount of the advance."

*Awuah II*, 740 F. Supp. 2d at 244.

[17]As indicated, under Coverall's standard franchise agreement or contract, Coverall recoups any compensation "advanced" if a customer is more than ninety days late in paying a bill.

that conditioning compensation on customer payment allows customers to ensure adequate service via threatened withholding of payment; were Coverall to pay its workers regardless of the level of customer satisfaction, Coverall would need to supervise the workers more closely. The result, Coverall contends, would be detrimental both to workers' freedom and to the amount they earned because of the greater intrusiveness and cost of supervision. Coverall's arguments fail.[18]

The Wage Act requires an employer to pay "the wages earned" to an employee within a fixed period of days after the end of a pay period. G. L. c. 149, § 148. The word "earn" is not statutorily defined, but its plain and ordinary meaning is "[t]o acquire by labor, service, or performance," or "[t]o do something that entitles one to a reward or result, whether it is received or not." Black's Law Dictionary 584 (9th ed. 2009). Where an employee has completed the labor, service, or performance required of him, therefore, according to common parlance and understanding he has "earned" his wage.[19]

That a Coverall customer may not have yet paid its bill within a week after the pay period does not affect Graffeo's right to wages he has earned. Graffeo is an employee, and, therefore, the obligation to pay him earned wages rests with Coverall, not third parties. The accounts-receivable financing system incorporated into Graffeo's contract, which classifies what are in reality wages for work performed as compensation "advances" that may be recouped, violates the "special contracts" provision of the Wage Act. See § 148 ("No person shall by a special contract with an employee or by any other means exempt himself from [§ 148 or § 150]"). At the same time, the method of recoupment under the contract, namely the "chargebacks," constitute improper deductions for purposes of the Wage Act.

[18]The argument Coverall makes about the disadvantages of intervening between workers and customers is in effect an argument about the relative merits of supervising employees versus paying independent contractors. It is a topic outside the scope of the questions certified to us. We presume the plaintiffs are employees, not independent contractors. See note 3, *supra.*

[19]Coverall analogizes its accounts receivable financing to the payment of commissions, but, as the judge also noted, Coverall does not argue that its workers are actually paid by commission. See *Awuah II,* 740 F. Supp. at 245 n.6. Special provisions, not applicable here, apply to payment of commissions. See § 148, third par.

See *Camara*, 458 Mass. at 760 (Attorney General reasonably interprets § 148 as "generally prohibiting an employer from deducting, or withholding payment of, any earned wages"). "Chargebacks" represent a means for Coverall to recapture wages already earned and paid. They are not a valid setoff; they correspond to no "clear and established debt owed to the employer by the employee." *Somers* v. *Converged Access, Inc.*, 454 Mass. 582, 593 (2009) (*Somers*). See *Camara*, *supra* at 763. If an employee's work is inadequate, Coverall is free to implement sanctions, including termination; Coverall is not free to withhold — much less recapture — the employee's earned wages. See *id.* at 763-764.

b. *Questions Two and Four.*[20] The second question asks whether, under Massachusetts law, "the 'damages incurred' for

[20]Before turning to details of any costs or fees in dispute here, we note the difficulty that arises because the "franchise agreement" between Coverall and Graffeo fits only awkwardly into the mold of an employment contract. In *Awuah II*, the judge implicitly equated amounts Coverall billed to customers with employee wages, and fees deducted by Coverall with deductions from wages. See *Awauh II*, 740 F. Supp. 2d at 242-243. When this is done, the question then becomes which, if any, of the deductions from such "wages" were permissible under Massachusetts law or, conversely, which constituted "damages incurred" as a result of misclassification.

The difficulty posed by this approach is that the amount billed to a Coverall customer is not necessarily the same as the cost of labor. In *Somers* v. *Converged Access, Inc.*, 454 Mass. 582 (2009) (*Somers*), this court held that an employer is not entitled to recalculate an employee's wage rate retroactively after it discovers it has misclassified him, because the Wage Act is intended to protect employees from the harms of misclassification, and an employer is not entitled to any "safe harbor" where it violates the Act. *Id.* at 592. In *Somers*, however, in contrast to this case, the contract between the employer and the misclassified employee identified a rate of pay — sixty-five dollars per hour worked — that was immediately recognizable as compensation for labor. See *id.* at 585. Here, although amounts billed to Coverall's customers operate as the starting point in the calculation of Graffeo's net pay, in essence the amount billed represents gross revenue, and not necessarily just the cost of labor. In other words, Coverall's customer billing rates presumably reflect some portion of its customer-related management costs, such as, for example, billing service costs. While we continue to interpret the Wage Act as placing the entire responsibility of proper classification on employers, see *id.* at 592, we acknowledge that the effort to recast the agreement between Coverall and Graffeo as purely an employment contract requires a strained interpretation of the agreement. In part for this reason, we decline the request of the plaintiffs to address all the types of costs or fees that are in dispute, and consider only those referred to directly in the certified questions, plus one other: the "franchise fees."

which a misclassified worker can seek recompense under [§ 150] include costs that an employer statutorily must bear?" The fourth question asks a related question: "Under Massachusetts law, may an employee and his employer lawfully agree that the employee will pay some or all of the cost of workers' compensation or other insurance coverage procured to alleviate the liability of the employer?" To these questions we answer, respectively, "Yes" and "No."

i. *Statutory mandates*. The judge focused on workers' compensation when discussing costs an employer is required by statute to pay. We do as well.

The Workers' Compensation Act, G. L. c. 152 (Workers' Compensation Act), " 'was designed to replace tort actions,' *Alves's Case*, 451 Mass. 171, 177 n.9 (2008), by providing 'a uniform, statutory remedy for injured workers, in contrast to a piecemeal, tort-based system.' " *Saab* v. *Massachusetts CVS Pharmacy, LLC*, 452 Mass. 564, 566-567 (2008), quoting *Green* v. *Wyman-Gordon Co.*, 442 Mass. 551, 559-560 (1996). See G. L. c. 152, § 24 (covered employees, unless they expressly reserve rights, deemed to have waived rights to recover against employers in tort). Under the Workers' Compensation Act, the obligation to secure workers' compensation insurance, or to self-insure, is on the employer alone. See G. L. c. 152, § 25A (every employer "shall provide for the payment to his employees of [workers'] compensation" by obtaining insurance, membership in workers' compensation self-insurance group, or license as self-insurer).[21] See also G. L. c. 152, § 25C, as amended through St. 2010, c. 285, § 1 (assessments, including civil fines and criminal penalties, for employers who fail to provide for insurance or self-insurance as required by chapter).

Coverall contends that, while it may be required to provide workers' compensation insurance for its employees, nothing in the Workers' Compensation Act prevents an employer and employee from agreeing that the employee is to be responsible for the insurance premiums. There is no merit to the claim.

---

[21]Certain workers are not defined as employees for the purposes of the Workers' Compensation Act. See G. L. c. 152, § 1 (4). Special provisions also apply to public employers. See G. L. c. 152, §§ 25B, 69-75. Graffeo does not fit any class of exempt employee.

This court has long observed that workers' compensation statutes, including the Commonwealth's, represent an "exercise of the police power" that "impose on the designated classes of employers of labor the burden of compensation for injuries to employees arising out of and in the course of their employment, leaving the employer to reimburse himself for the expense as a part of the cost of his product." *Opinion of the Justices*, 309 Mass. 562, 567-568 (1941), quoting *Howes Bros. Co.* v. *Unemployment Compensation Comm'n*, 296 Mass. 275, 284 (1936). Indeed, since its enactment in the early Twentieth Century, the purpose of the Workers' Compensation Act has been "to treat the cost of personal injuries incidental to the employment as a part of the cost of the business." *Madden's Case*, 222 Mass. 487, 494-495 (1916). Reforms to the Act over time have never altered that fundamental premise. See L.Y. Nason, C.W. Koziol, & R.A. Wall, Workers' Compensation § 2.8, at 35 (3d ed. 2003) (1991 reforms, still effective, "acknowledged the premise that workplace injuries were a factor in the costs of doing business"). Finally, employers' responsibility for paying the cost of workers' compensation insurance is made clear by the provision in the Act imposing criminal penalties on employers who try to evade workers' compensation requirements by misclassifying employees. See G. L. c. 152, § 14 (3) ("any person or employer who knowingly misclassifies employees . . . for the purpose of *avoiding full payment of insurance premiums* . . . shall be punished" [emphasis added]).

In sum, to permit an employer to transfer to its employees the cost of workers' compensation insurance premiums would be inconsistent with both the general intent and the specific language of the Workers' Compensation Act. We therefore conclude that an employee such as Graffeo may recover, as "damages incurred," any such insurance premiums that he was obliged to pay to Coverall under the terms of his contract.

Coverall's contrary argument notwithstanding, G. L. c. 154, § 8, does not change our view. That section states, in part:

> "None of the foregoing sections of this chapter [G. L. c. 154, regulating assignment of wages], nor [G. L. c. 149, § 148], shall be applicable to or control or prohibit the

deduction of labor or trade union or craft dues or obliga-
tions, or making deposits in, purchasing shares of, or for
the repayment of any loan from any credit union established
under the laws of the commonwealth or of the United
States, or deposits in any savings bank, trust company,
national banking association or co-operative bank, or
subscriptions to a non-profit hospital service corporation
established under [G. L. c. 176A], or to a medical service
corporation established under [G. L. c. 176B], or to a
charitable corporation, or *payments or contributions of or
toward the cost of or the premiums on any insurance
policy* or annuity contract or purchase of government
bonds, or purchase of stock pursuant to an employee
stock purchase plan, from wages of an employee by an
employer in accordance with a written request made by
the individual employee . . ." (emphasis added).

When a statute lists elements in a series, the rules of statutory
construction guide us to construe general phrases as restricted
to elements similar to specific elements listed. See, e.g., *Com-
monwealth* v. *Zubiel*, 456 Mass. 27, 31 (2010) (principle of
ejusdem generis allows specific words to identify class). The
specific elements listed in G. L. c. 154, § 8, are contributions
made in furtherance of an employee's interests, such as toward
union dues, loan repayments and savings plans, health insur-
ance, and voluntary charitable contributions. We therefore
construe "any insurance policy" in G. L. c. 154, § 8, to apply
to contributions toward *employee* insurance policies, such as
health, vision, dental, and life insurance, not to insurance poli-
cies that operate primarily to insure *employers* against liability.
At any rate, G. L. c. 154, § 8, is one provision in a chapter of
the General Laws relating to assignment of wages, while our
conclusion concerning workers' compensation costs is based
on independent grounds, namely, the language and intent of the
Workers' Compensation Act, G. L. c. 152, as explained above.

ii. *Other insurance costs.* We turn to costs related to insur-
ance other than workers' compensation that are identified in the
record, such as janitorial bonding, comprehensive liability insur-
ance, and any elements of the FOJ program that exceeded the
scope of workers' compensation insurance. We view these insur-
ance coverages as intended to protect against the risk of damage
to an employer's property, or the risk of injury to the person or

property of a third party for which an employer may become financially responsible. An employee may be liable to an employer for damage caused by the employee to property belonging to the employer or to a third party, for example if the damage was inflicted intentionally, recklessly, or even negligently. See *Camara*, 458 Mass. at 763 n.12, 764 n.14. But before such costs may be imposed on an employee, the employee must be afforded the right to an adjudication of his responsibility in a manner that is procedurally fair. *Id.* at 763-764 n.13.

In *Camara*, this court decided that where the employer unilaterally determines issues of employee fault and the amount of damages to be paid by an employee, even if the employee opted to pay the damages in lieu of discipline, a paycheck deduction was not in satisfaction of a clear and established debt and was therefore not a valid setoff against wages under the Wage Act. *Id.* at 762-764. It follows that a deduction for liability-focused insurance costs, in the absence of any indication of error on an employee's part, is also improper. Stated otherwise, an employer may not deduct insurance costs from an employee's wages where those costs are related to future damages that may never come to pass, and even if they do, may not be the responsibility of the employee. Any such deduction constitutes "damages incurred" for the purposes of the Wage Act.[22]

iii. *Franchise fees.* In light of the judge's statement that he welcomed other advice about Massachusetts law that is relevant to this case, we address "franchise fees," i.e., the initial and additional fees that Graffeo agreed to pay Coverall in order to enter into what the judge has determined to be a direct employ-

---

[22]An agreement between an employer and an employee that the employee will obtain insurance for the benefit of the employer also violates the Wage Act because it is a "special contract" that has the effect of exempting the employer from the obligations to pay earned wages in full. See § 148. Cf. 29 C.F.R. § 531.35 (2010) (under Federal Fair Labor Standards Act of 1938, " 'wages' cannot be considered to have been paid . . . unless they are paid finally and unconditionally or 'free and clear,' [and not] 'kick[ed]-back' . . . to another person for the employer's benefit"). An employer's insurance costs, when borne by an employee, reduce wages just as effectively as if the employer had obtained the policy and deducted funds from the wages. See G. L. c. 149, § 150 ("assignment of future wages payable weekly under [§ 148] shall not be valid . . . if made or procured to be made to another person for the purpose of relieving the employer from the obligation to pay weekly").

ment relationship with Coverall. Our view is that fees such as these constitute "special contracts," not usual between employers and employees. In substance, they operate to require employees to buy their jobs from employers, and in that respect we think they violate public policy.[23] See *Adams* v. *Tanner*, 244 U.S. 590, 604 (1917) (Brandeis, J., dissenting), quoting United States Bureau of Labor Bull. No. 109, at 36 (Oct. 1912) ("paying for the privilege of going to work, and paying more the more urgently the job is needed, not only keeps people unnecessarily unemployed, but seems foreign to the spirit of American freedom and opportunity"). Cf. 29 C.F.R. § 531.35 (2010) ("wage requirements of the [Federal Fair Labor Standards Act of 1938 (FLSA), 29 U.S.C. §§ 201-219,] will not be met where the employee 'kicks-back' directly or indirectly to the employer or to another person for the employer's benefit the whole or part of the wage delivered to the employee").

A contract term that violates public policy is not entitled to be enforced. See, e.g., *Warfield* v. *Beth Israel Deaconess Med. Ctr., Inc.*, 454 Mass. 390, 397-398 (2009). Examined in the context of the Wage Act, the "franchise fees" paid by Graffeo do not represent a "clear and established debt," see *Somers*, 454 Mass. at 593, and to the extent that such fees are paid back to Coverall out of wages earned from Coverall, they represent a prohibited assignment of an employee's future wages to his employer. See § 150.[24] See generally *Beacon Hill Civic Ass'n* v. *Ristorante Toscano, Inc.*, 422 Mass. 318, 324 (1996), quoting *Desseau* v. *Holmes*, 187 Mass. 486, 488 (1905) ("where a 'statute . . . rests upon grounds of public policy, it is not in the power of one who may be directly affected by it to contract in advance

---

[23]We emphasize that our concerns over "franchise fees" relate to the potentially exploitative nature of payments by an employee to an employer for the purpose of securing employment. We expressly do not conclude that franchise fees violate public policy when they are agreed to by parties who are not in an employer-employee relationship.

[24]General Laws c. 149, § 150, provides in part:

"An assignment of future wages payable weekly under [§ 148] shall not be valid if made to the person from whom such wages are to become due or to any person on his behalf, or if made or procured to be made to another person for the purpose of relieving the employer from the obligation to pay weekly."

that it may be disregarded' "). Accordingly, Graffeo is entitled to recover franchise fees as a type of "damages incurred."

3. *Conclusion.* For the reasons stated, we answer, "No" to the first certified question, "Yes" to the second certified question, "No" to the third certified question, and "No" to the fourth certified question.

The Reporter of Decisions is to furnish attested copies of this opinion to the clerk of this court. The clerk in turn will transmit one copy, under the seal of the court, to the clerk of the United States District Court for the District of Massachusetts, as the answers to the questions certified, and will also transmit a copy to each party. See, e.g., *DiFiore* v. *American Airlines, Inc.,* 454 Mass. 486, 497 (2009).