DENISE MEGIEL-ROLLO *vs.* CONTRIBUTORY RETIREMENT
APPEAL BOARD & another.[1]

No. 10-P-1742.

Suffolk. October 13, 2011. - February 21, 2012.

Present: KAFKER, TRAINOR, & MEADE, JJ.

*Contributory Retirement Appeal Board. Teachers' Retirement Board. Public Employment,* Retirement benefits. *School and School Committee,* Retirement benefits.

This court concluded that the Contributory Retirement Appeal Board (board) did not err in determining that, in order for the plaintiff (a former teacher) to qualify for a termination allowance under G. L. c. 32, § 10(2), her termination must have been involuntary; further, this court concluded that there was substantial and sufficient evidence on the record supporting the board's finding that the plaintiff was not removed or discharged within the meaning of § 10(2) but rather was voluntarily terminated, pursuant to a settlement agreement, within the meaning of G. L. c. 32, § 10(1); therefore, this court vacated the judgment of the Superior Court awarding the plaintiff benefits under § 10(2) and remanded the matter for the entry of judgment affirming the board's decision to award the plaintiff a superannuation allowance under § 10(1). [320-325]

CIVIL ACTION commenced in the Superior Court Department on July 9, 2009.

The case was heard by *Peter M. Lauriat,* J., on a motion for judgment on the pleadings.

*Suleyken D. Walker,* Assistant Attorney General, for Teachers' Retirement System.

*Nicholas Poser* for the plaintiff.

TRAINOR, J. The defendant, Teachers' Retirement System (TRS), appeals from a judgment of the Superior Court vacating a decision of the Contributory Retirement Appeal Board (CRAB), and awarding termination benefits to the plaintiff, Denise Megiel-Rollo, under G. L. c. 32 § 10(2).

---

[1]Teachers' Retirement System.

*Facts.*[2] Megiel-Rollo was a teacher at Bristol County Agricultural High School (Bristol) between 1982 and 2002.[3] In 1994, she filed a complaint against Bristol with the Massachusetts Commission Against Discrimination (MCAD) alleging discrimination. In 1997, the MCAD made a finding of probable cause on her claim. Four years later, in October 2001, Bristol and Megiel-Rollo entered into negotiations for a possible settlement to resolve the MCAD claim. Prior to entering settlement negotiations, Megiel-Rollo had never been notified or advised of any possibility or consideration of Bristol terminating her employment, and she had recently received a satisfactory performance evaluation for the 2000-2001 school year.[4] Early in October, 2001, Megiel-Rollo and Bristol entered into a settlement agreement intended to resolve her discrimination complaint.

The parties agreed that immediately upon execution of the settlement agreement Megiel-Rollo would be placed on a paid leave of absence until June 30, 2002, a period of eight months. During the leave of absence she would continue to receive health insurance benefits, contractually accrued sick leave benefits, and retirement credits.[5] The settlement agreement provided that Bristol would forward a letter of termination notice to Megiel-Rollo on or about June 30, 2002, effective within five days of its mailing.[6] In addition, Bristol agreed to pay Megiel-Rollo a final cash payment of $54,760.49. The

---

[2]We take our facts from those found by the Division of Administrative Law Appeals (DALA) and adopted by CRAB. Megiel-Rollo does not dispute any of the facts as found by DALA, although she requested that CRAB add an additional finding that Bristol Agricultural High School insisted that she be terminated as a condition to its agreeing to settle her discrimination complaint. CRAB apparently declined to add the finding and concluded that it would not affect the result in any event.

[3]She became a member of TRS in 1978, being employed at the Essex Agricultural and Technology High School, and she appears to have been a continuous member of TRS from 1978 to 2002, except for a period of time from September, 1990, to June, 1991, during which she was laid off.

[4]The evaluation contained the following observation: "Ms. Megiel-Rollo is a teacher with professional status who continues to strive to achieve all standards under ed reform particularly in the accommodations of students' diverse learning styles employing a myriad of teaching strategies."

[5]The agreement presumably increased her sick leave buy back at the time of her retirement as well as the amount of her retirement allowance.

[6]The application for retirement form that retiring teachers must submit to

settlement agreement required that upon its execution Megiel-Rollo would immediately leave the building and grounds of Bristol and never again enter the grounds or building.

Megiel-Rollo was allowed twenty-one days to consider the settlement agreement and an additional seven days after execution within which to revoke it.[7] The agreement contained a provision that both parties acknowledged that they were entering into the agreement voluntarily. Both parties signed and executed the settlement agreement on October 10, 2002.

Megiel-Rollo applied for a termination allowance under G. L. c. 32, § 10(2), shortly thereafter. The TRS sent Bristol a letter requesting information about the reason for Megiel-Rollo's departure and whether she had been terminated. Bristol responded that Megiel-Rollo had been terminated in order to "resolve litigation." The TRS then denied Megiel-Rollo's application for a termination allowance under § 10(2), and she was instead awarded superannuation benefits under G. L. c. 32, § 10(1).

Megiel-Rollo appealed the denial to CRAB, which assigned a Division of Administrative Law Appeals (DALA) magistrate to hold a hearing, after which the denial of § 10(2) benefits was affirmed. Megiel-Rollo filed an objection with CRAB, which in 2009 affirmed the decision of the DALA magistrate on the basis that Megiel-Rollo's departure was voluntary. Megiel-Rollo sought judicial review of CRAB's decision in the Superior Court. A Superior Court judge vacated CRAB's decision, anchoring his own definition of "discharge" not on the distinction between "voluntary" and "involuntary" but on what the court referred to as "some action on the part of the employer to terminate the employee[']s employment." The judge held that Bristol "terminated Megiel-Rollo's employment . . . by sending her a notice of termination" and that "[s]he was therefore 'discharged' from her employment within the meaning of G. L. c. 32, § 10(2)." Judgment was entered in favor of Megiel-Rollo, CRAB's decision was vacated, and the case was remanded

CRAB states that an applicant must attach a copy of their "notice of termination" if they choose to apply for a termination allowance under G. L. c. 32, § 10(2).

[7] This provision is required by the Older Workers Benefit Protection Act, 29 U.S.C. § 626 (2000).

to CRAB for the entry of an order in favor of Megiel-Rollo. The TRS then filed this appeal seeking reversal of the Superior Court judgment.

We vacate the judgment of the Superior Court and affirm the decision of the Contributory Retirement Appeals Board.

*Discussion.* We review CRAB's decision to deny § 10(2) benefits and award § 10(1) benefits to determine whether Megiel-Rollo's rights have been prejudiced under the guidance of G. L. c. 30A, § 14(7).[8] See *Tabroff* v. *Contributory Retirement Appeal Bd.*, 69 Mass. App. Ct. 131, 134 n.2 (2007).

Our review of CRAB's decision is made "under a deferential standard and [we] will reverse only if [CRAB's] decision was based on an erroneous interpretation of law or is unsupported by substantial evidence." *Foresta* v. *Contributory Retirement Appeal Bd.*, 453 Mass. 669, 676 (2009). See *State Bd. of Retirement* v. *Contributory Retirement Appeal Bd.*, 77 Mass. App. Ct. 452, 455 (2010).

To the extent that an agency determination involves a question of law, it is subject to de novo judicial review. See *Bristol County Retirement Bd.* v. *Contributory Retirement Appeal Bd.*, 65 Mass. App. Ct. 443, 451 (2006); *Olsen* v. *Teachers' Retirement Bd.*, 70 Mass. App. Ct. 429, 431 (2007), quoting from *Bulger* v. *Contributory Retirement Appeal Bd.*, 447 Mass. 651, 657 (2006) ("we must overturn agency decisions that are not consistent with governing law").

To the extent that an agency determination is based on a finding of fact, under the substantial evidence standard, "we must give 'due weight to the experience, technical competence, and specialized knowledge of the agency, as well as to the discretionary authority conferred upon it' . . . ." *Ibid.* "[A] reviewing

---

[8]Section 14(7) of G. L. c. 30A, as amended by St. 1973, c. 1114, § 3, provides that an agency's decision can be set aside if it is determined to be:

"(a) In violation of constitutional provisions; or (b) In excess of the statutory authority or jurisdiction of the agency; or (c) Based upon an error of law; or (d) Made upon unlawful procedure; or (e) Unsupported by substantial evidence; or (f) Unwarranted by facts found by the court on the record as submitted or as amplified under paragraph (6) of this section, in those instances where the court is constitutionally required to make independent findings of fact; or (g) Arbitrary or capricious, an abuse of discretion, or otherwise not in accordance with law."

court is not empowered to make a de novo determination of the facts, to make different credibility choices, or to draw different inferences from the facts found by the [agency]." *Medi-Cab of Mass. Bay, Inc.* v. *Rate Setting Commn.*, 401 Mass. 357, 369 (1987).

General Laws c. 32, § 10, determines retirement allowances for members of the retirement system who resigned, failed reappointment, or were removed or discharged from service. We consider the textual differences between § 10(1) (right to a superannuation retirement allowance) and § 10(2) (right to a termination retirement allowance) in order to determine which paragraph, § 10(1) or § 10(2), is implicated by the facts and circumstances here.

Section 10(1), as amended through St. 2000, c. 123, § 24A, provides, in pertinent part, a retirement allowance for a member of the retirement system who (1) has completed twenty or more years of creditable service and who (2) "resigns or voluntarily terminates his service" or who (3) "fails of reappointment or whose office or position is abolished, or is removed or discharged from his office or position without moral turpitude on his part . . . ."[9]

Section 10(2) provides, in pertinent part, a retirement allowance for a member of the retirement system who (1) "has completed twenty or more years of creditable service" and who (2) "fails of reappointment, or whose office or position is abolished, or is removed or discharged from his office or position without moral turpitude on his part . . . ."[10]

As pertaining here, the single difference between the provi-

[9]Additionally, § 10(1) provides a retirement allowance for any member who has attained the age of fifty-five years, regardless of the number of creditable years of service, under the same conditions as we list above, except that a "voluntary termination" is not included. Megiel-Rollo was not eligible for this option, in any event.

The retirement allowance for members retiring under the provisions of § 10(1) is calculated pursuant to the provisions of G. L. c. 32, § 5.

[10]Additionally, § 10(2) provides the same retirement allowance to any member who has completed thirty or more years of creditable service, and who resigns his position while not having attained the age of fifty-five years. Megiel-Rollo was not eligible for this option either.

The retirement allowance for those retiring under the provision of § 10(2) is calculated within § 10(2).

sions of § 10(1) and § 10(2) indicates that a member who has twenty or more years of creditable service and who "resigns or voluntarily terminates his service" can *only* retire under the provisions of § 10(1). The remaining qualifications that a member "fails of nomination or re-election, or fails of reappointment, or whose office or position is abolished, or is removed or discharged from his office or position" appear in both § 10(1) and § 10(2). This statutory construction indicates that a member, so retiring, can chose to retire under the provisions of *either* § 10(1) or § 10(2), presumably depending on which retirement allowance calculation is more beneficial to their particular circumstances.

CRAB interprets the terms "removed or discharged" for the purposes of § 10(1) and § 10(2) eligibility as the *involuntary* discharge of an employee as distinct from a voluntary termination or resignation of an employee, who, as we discussed above, can only retire under the provisions of § 10(1).

The Superior Court judge determined, and Megiel-Rollo now argues, that the basis for eligibility for benefits under § 10(2) is the presence of "some action on the part of the employer to terminate the employee's employment," *not* whether the termination was involuntary. The trial judge reasoned that because Bristol sent a letter of termination, it discharged Megiel-Rollo for the purposes of § 10(2) regardless of the section's larger context and the specific language contained in § 10(1). We do not agree with this reasoning.

First, this interpretation would render the phrase "voluntary termination" in § 10(1) meaningless. In every case a termination will ultimately be effectuated by an action of the employer in the form of a notice of termination and would automatically render the termination "involuntary." The phrase "voluntary termination" would have no meaning within the statute under that reasoning. We cannot read statutory language to be meaningless or superfluous, particularly where the phrase in question has a clear meaning within the statute's context. See *Wolfe* v. *Gormally*, 440 Mass. 699, 704 (2004), quoting from *Bankers Life & Cas. Co.* v. *Commissioner of Ins.*, 427 Mass. 136, 140 (1998) ("basic tenet of statutory construction requires that a statute 'be construed . . . so that no part will be inoperative or

superfluous' "); *Bulger* v. *Contributory Retirement Appeal Bd.*, *supra* at 661, quoting from *Commissioner of Rev.* v. *Cargill, Inc.*, 429 Mass. 79, 82 (1999) ("Where . . . the language of the statute is clear, it is the function of the judiciary to apply it, not amend it"). See also *Telesetsky* v. *Wight*, 395 Mass. 868, 872 (1985); *Sterilite Corp.* v. *Continental Cas. Co.*, 397 Mass. 837, 839 (1986).

A review of the legislative history of G. L. c. 32, § 10, is consistent with this interpretation. When it was enacted in 1945, G. L. c. 32, § 10, allowed employees who resigned a superannuation allowance under § 10(1), but not a termination allowance under § 10(2). St. 1945, c. 658, § 1. The phrase "voluntary termination" appeared in neither section. In 1950, the Legislature added employees who resigned to those eligible for § 10(2) benefits but removed that eligibility one year later. St. 1951, c. 784, § 1. At the same time, the Legislature added the "voluntary termination" provision to § 10(1). The Legislature clearly and intentionally added the phrase "voluntary termination" as a concept related to, but distinguished from, the phrase "resignation." Cf. *Costello* v. *School Comm. of Chelsea*, 27 Mass. App. Ct. 822, 827 (1989) (legislative history of the addition and subtraction of certain terms to G. L. c. 32, § 10, "evinces an awareness that there is a difference between a 'removal or discharge' and 'failure of reappointment' ").

In a similar context, the Supreme Judicial Court has addressed the "voluntariness" of a resignation in situations implicating the unemployment compensation statute, which, with some exceptions, denies benefits to employees who leave their job voluntarily. See G. L. c. 151A, § 25(*e*). See, e.g., *Retirement Bd. of Attleboro* v. *School Comm. of Attleboro*, 417 Mass. 24, 26 (1994) (considering the meaning of the word "removal" in G. L. c. 71, § 43B [1992 ed.], in interpreting the term "removal" in G. L. c. 32, § 16[2]).

In *Connolly* v. *Director of the Div. of Unemployment Assistance*, 460 Mass. 24, 25 (2011), citing *White* v. *Director of the Div. of Employment Sec.*, 382 Mass. 596, 598-599 (1981), the Supreme Judicial Court held that "a resignation . . . will be deemed involuntary if the employee reasonably believed that his discharge was imminent." See *State St. Bank & Trust Co.* v.

*Deputy Director of the Div. of Employment & Training*, 66 Mass. App. Ct. 1, 7-8 (2006). In *Connolly*, the plaintiff seeking benefits was held to have left voluntarily when "she was not compelled to apply [for a voluntary termination package], did not believe her job was in jeopardy, and left in part for personal reasons." *Connolly, supra* at 29.

In the case before us, the evidence substantially supported CRAB's conclusion that Megiel-Rollo could not have reasonably believed that her employment would soon be terminated if she did not sign the settlement agreement. She testified that she had not been told by anyone at Bristol that she was in danger of being terminated from her position, and her evaluation for the school year preceding the settlement negotiations was "largely positive." Further, a provision of the settlement agreement stated that Bristol "wishe[d] to enter this agreement solely for the purpose of avoiding costs of litigation."

Additionally, we must acknowledge the benefit of the bargain Megiel-Rollo received in the negotiation. While Bristol disposed of the discrimination suit, she received nine months' paid leave of absence while continuing to receive health insurance benefits and accrue sick time, as well as continuing to accrue retirement credits. At the end of this paid leave, she received a substantial cash award and a letter of termination, which was intended to qualify her for the retirement allowance provided by § 10(2). The provisions of this agreement do not evidence an "involuntary termination."[11]

There are additional public policy reasons to discourage the grant of a § 10(2) retirement allowance for terminations negotiated in the context of such a settlement agreement. In future settlement negotiations, or similar situations that arise between employees and their public employers, there is a danger that the parties would add a term to the settlement providing a termination letter, even where the employee had no reasonable expectation of being fired and where termination would not have

---

[11]The trial judge attached significance to the provision barring Megiel-Rollo from ever returning to the school grounds. Although the provision indicates some level of acrimony in the separation, it is not evidence that Megiel-Rollo reasonably believed that she would lose her job if the settlement negotiations failed.

otherwise occurred. For the employee, the benefit of such a letter may result in receiving higher retirement benefits than the employee may otherwise have received, and such a letter could be a valuable bargaining chip of no detriment to the employer's financial bottom line. As the Contributory Retirement Fund in Massachusetts is made up solely of contributions from its members, those members would incur the cost of the higher termination allowance brought about by such a settlement. See, e.g., *Hoerner* v. *Public Sch. Employees' Retirement Bd.*, 546 Pa. 215, 225 (1996) (holding that the Pennsylvania retirement board, not the language of employee's negotiated termination agreement, had the power to determine benefits due under that State's retirement code).

We conclude that CRAB's determination, that to qualify for a termination allowance under G. L. c. 32, § 10(2), the termination must be involuntary, was not an error of law. Also, there was substantial and sufficient evidence on the record supporting CRAB's finding that Megiel-Rollo was not "removed or discharged" under § 10(2) but rather was "voluntarily terminated" under § 10(1), and that, as the DALA magistrate found, by voluntarily signing the settlement agreement Megiel-Rollo "herself chose to leave her position at (Bristol)." We therefore vacate the judgment of the Superior Court and remand for the entry of judgment affirming CRAB's decision to award the plaintiff a superannuation allowance under G. L. c. 32, § 10(1).

*So ordered.*