Krupp, Peter B., J.
This administrative appeal under G.L.c. 30A, §14(7) is before the court on a motion by plaintiff Barbara Nolan (“Nolan”) for judgment on the pleadings.
Nolan, a 20-year employee of the University of Massachusetts at Lowell (“UMass Lowell”), contends that she was terminated from her position at the UMass Lowell and therefore, despite the fact that she applied for a one-time payment through a UMass Lowell early retirement incentive program, defendant State Board of Retirement (“the Board”) should have approved her application for a termination retirement allowance under G.L.c. 32, §10(2)(a).[2] After the Board denied Nolan’s application, she appealed to the Division of Administrative Law Appeals (“DALA”). A DALA administrative magistrate found facts after an eviden-tiary hearing and reversed the Board. The Board appealed to defendant Contributory Retirement Appeal Board (“CRAB”), which reversed the DALA decision and reinstated the Board’s determination. Nolan now appeals to this court.
After hearing on March 27, 2013, and for the reasons that follow, Nolan’s motion is ALLOWED.
FACTUAL BACKGROUND
The facts found by DALA are not in dispute and were not challenged by either party before CRAB. They are set out in the decisions by DALA (dated March 11, 2011) and CRAB (April 26, 2012), both of which are attached to Plaintiffs Memorandum of Law in Support of Motion for Judgment on the Pleadings. The court incorporates those facts by reference and merely summarizes the most salient facts here.
Nolan started working at UMass Lowell on September 1, 1990 and was eligible to participate in the Massachusetts retirement system. Her last position at UMass Lowell was associate manager for the university’s Center for the Arts, including work with the Students and Teachers for the Arts program (“STARTS”).[3] Nolan reported to Christine Brown (“Brown”), the director of STARTS, who earned more than Nolan.
In the fall of 2008, UMass Lowell faced significant budget pressures and decided to terminate STARTS unless additional funding could be secured for the program. On November 25, 2008, the director of human resources at UMass Lowell notified Nolan of its intent to terminate her employment effective March 31, 2009.
The Chancellor’s office at UMass Lowell later decided to keep STARTS running during the remainder of the fiscal year, which ended June 30, 2009. Brown was terminated effective March 31, 2009 and secured a termination allowance under G.L.c. 32, §10(2){a). Nolan was put in charge of STARTS at her existing compensation and ran the program for 2009. By the fall of 2009, UMass Lowell decided to end STARTS in the spring of 2010, and to have Nolan continue to run it until that time. UMass Lowell also decided that Nolan would continue to work to close out STARTS during the summer of 2010 in the hope that outside donors would be found to permit STARTS to continue to operate. No sufficient funding was located.
In April 2010, UMass Lowell announced an early retirement incentive program (“ERIP”) to encourage early retirement from the university. To participate, employees were required to leave the UMass Lowell payroll no later than June 30, 2010, unless extended for no more than six months at the discretion of the Chancellor. Nothing in the ERIP notice to UMass Lowell employees made the ERIP program unavailable to those who were then in positions being eliminated by the university.
*242 On April 22, 2010, Nolan filed an application form to participate in the ERIP, giving notice of her intention to retire from her position effective September 6,2010.
On May 17, 2010, UMass-Lowell issued its official termination letter to Nolan, terminating her employment due to budget constraints and the abolition of her position effective September 6, 2010.
Nolan continued working through the spring and summer of 2010, completing the work of, and closing out, STARTS. Nolan’s last day of work with UMass Lowell was September 6, 2010. She was 58 years old.
DISCUSSION
A. Standard of Review
The court reviews CRAB’s decision to deny G.L.c. 32, § 10(2) benefits under the standard set out in G.L.c. 30A, §14(7). Megiel-Rollo v. Contributory Retirement Appeal Board, 81 Mass.App.Ct. 317, 320 (2012). Under G.L.c. 30A, §14(7), this court may reverse, remand or modify the CRAB decision if the substantial rights of any party may have been prejudiced because the agency decision is based on an error of law or an unlawful procedure, arbitrary and capricious or unwarranted by facts found by the agency and unsupported by substantial evidence. Rivas v. Chelsea Hous. Auth., 464 Mass. 329, 334-35 (2013).
The plaintiff bears the burden of demonstrating the invalidity of the agency’s decision. Merisme v. Bd. of Appeals on Motor Vehicle Liab. Policies and Bonds; 27 Mass.App.Ct. 470, 474 (1989). The court reviews CRAB’s decision “under a deferential standard.” The court will uphold the CRAB decision unless it “was based on an erroneous interpretation of law or is unsupported by substantial evidence.” Megiel-Rollo, 81 Mass.App.Ct. at 320, quoting Foresta v. Contributory Retirement Appeal Bd., 453 Mass. 669, 676 (2009). To the extent CRAB’s decision rests on a question of law, the court reviews it de novo. Megiel-Rollo, 81 Mass.App.Ct. at 320 (and cases cited). On matters of fact, the court may not substitute its judgment for that of the agency, S. Worcester County Regional Vocational Sch. v. Labor Relations Comm’n, 386 Mass. 414, 420-21 (1982), but must uphold those factual findings unless they are unsupported by substantial evidence, giving weight to the agency’s specialized knowledge and discretionary authority, and without drawing different inferences from the facts. Megiel-Rollo, 81 Mass.App.Ct. at 320-21 (and cases cited).
B. Entitlement to Benefits under G.L.c. 32, §10(2)
Nolan’s position at UMass Lowell was being eliminated. Nolan’s supervisor was terminated effective March 31, 2009 and received a termination allowance under G.L.c. 32, §10(2). Nolan was asked to stay on to complete STARTS’ commitments and to wrap up its affairs. The only question was when Nolan’s position would be officially eliminated. With the handwriting on the wall, she applied for the one-time ERIP payment though UMass Lowell.
Nolan contends that CRAB was wrong as a matter of law when it looked myopically at the ERIP application alone to find as a matter of law that she was not entitled to retirement benefits under G.L.c. 32, §10(2). Although the Board concedes UMass Lowell decided to abolish Nolan’s position, it contends that her application for the one-time $10,000 payment through the ERIP disqualified her for the enhanced termination retirement allowance under section 10(2). The court disagrees with the Board as a matter of law.
The relevant statute, G.L.c. 32, §10(2), provides: “Any member who retires under the provisions of this section, who has completed twenty or more years of creditable service and who fails of reappointment, or whose office or position is abolished, or is removed or discharged from his office or position without moral tuipitude on his part. . . shall receive” an enhanced termination retirement allowance. Nothing contained in the statute bars a person from obtaining the termination retirement allowance where the person’s “office or position is abolished,” or where the person “is removed or discharged,” but who also is able to partake of another incentive program.
The Appeals Court’s recent decision in Megiel-Rollo demonstrates the need to look at the big picture in determining whether an employee is entitled to a termination retirement allowance under section 10(2). In Megiel-Rollo, the plaintiff teacher filed a discrimination complaint against her employer, a high school, which was resolved through a settlement agreement. 81 Mass.App.Ct. at 318-19. Under the settlement agreement, the school agreed to pay the teacher a lump sum and she agreed immediately to leave the school and never return; however, it was also agreed, the teacher would be put on paid leave for eight months after which time the school would send a termination letter to the teacher effective within five days of mailing. Id. Notably in that case, before entering into settlement negotiations, the teacher “had never been notified or advised of any possibility or consideration of [the school] terminating her employment, and she had recently received a satisfactory performance evaluation for the [prior] school year.” Id. at 318. After the eight months and receipt of the termination letter required under the negotiated settlement agreement, the teacher applied for termination retirement benefits under G.L.c. 32, §10(2), pointing to the termination letter as an action by the school to terminate her employment. Id. at 319. After DALA and CRAB both upheld the denial of termination benefits under section 10(2), the Superior Court vacated the CRAB decision and entered judgment in favor of the teacher, relying on the fact that the employer had sent the termination notice. Id. at 319-20.
*243 In vacating the Superior Court and affirming CRAB, the Appeals Court relied heavily on the fact that, absent the settlement agreement, the teacher “could not have reasonably believed that her employment would soon be terminated.” Id. at 324. To the contrary, the Court analyzed the settlement agreement and found that it did “not evidence an ‘involuntary termination.’ ” Id. The Court also recognized the “additional public policy reasons to discourage the grant of a §10(2) retirement allowance for terminations negotiated in the context of such a settlement agreement.” Id. at 324-25. Thus, the Court upheld CRAB’s interpretation that “to qualify for a termination allowance under G.L.c. 32, §10(2), the termination must be involuntary” and that “by voluntarily signing the settlement agreement Megiel-Rollo ‘herself chose to leave’ ” her employment at the school. Id. at 325. See also Connolly v. Director of the Div. of Unemployment Asssistance, 460 Mass. 24, 25 (2011) (resignation “will be deemed involuntary if the employee reasonably believed that his discharge was imminent”).
The facts here are very different. Here, the evidence was overwhelming that UMass Lowell, as a result of budget constraints, eliminated Nolan’s position and the program she administered. UMass Lowell notified Nolan that her position would be eliminated and it terminated her supervisor. Thereafter, Nolan was permitted to stay on to continue to run STARTS, and finally to wind down the program. UMass Lowell notified Nolan on May 17, 2010 that her position would be terminated effective September 6, 2010. This was not a notice as a result of an agreement between UMass Lowell and Nolan, as in Megiel-Rollo, but was the culmination of over a year of efforts by UMass Lowell to cut its budget by eliminating the functions that Nolan performed in a considered way that would minimize adverse impacts on the community. Nolan knew for upwards of a year that her position was in jeopardy due to budget constraints. Furthermore, there is no suggestion in the record that Nolan was motivated to leave UMass Lowell in part by “personal reasons,” for instance, a dislike of her job or the length of her commute, as were significant in finding an employee’s departure voluntary in Connolly. 460 Mass, at 26. Nolan cannot be said to have “resign(ed)” or “voluntarily terminate[d] h[er] service,” within the meaning of those terms in G.L.c. 32, §10(1).
The fact that Nolan was permitted, on these facts, to participate in UMass Lowell’s ERIP and secure a one-time $10,000 payment pursuant to that program does not change her eligibilify for a termination retirement allowance. Nothing in the ERIP notice indicated it was unavailable to employees who had already been notified that their positions would be eliminated. Nor did Nolan’s application for the ERIP payment indicate anything about the voluntariness of her termination. In her application, she merely notified the university of her “intent to retire” on September 6, 2010. See Administrative Record at 57. It is easy to envision a retirement incentive program that could be offered that would truly require an employee to choose between a one-time ERIP payment'and a termination retirement allowance under the Massachusetts retirement system.[4] This ERIP did not do so.
Whether Nolan was entitled to the ERIP payment through UMass Lowell, or should have to repay those benefits, is not before the court. The only question is whether Nolan qualifies for the termination benefits permitted under G.L.c. 32, §10(2). Given that UMass Lowell initiated the termination process and pursued it consistently, the answer to the question, as a matter of law, is yes.
C. Evidence of Collusion
The Board contends that CRAB’s finding that there was no “collusion” within the meaning of G.L.c. 32, § 10(2) (c) between UMass Lowell and Nolan was unsupported by substantial evidence. On this issue, DALA found that UMass Lowell decided in the fall of 2009 that Nolan’s job was not going to be saved; the only question was how long to keep STARTS going; STARTS had performances scheduled into spring 2010; contracts ran through June 2010; and UMass Lowell needed someone to close down STARTS and explore an alternative program. As a result, DALA found that Nolan was not on the payroll through September 6, 2010 just to allow her to reach 20 years of creditable service, and that the evidence did not show collusion or conspiracy to secure a termination allowance for Nolan. See DALA Decision at 13.
CRAB agreed with DALA’s findings. Despite the Board’s urging, CRAB refused to “find that qualifying for the termination allowance was the sole reason for extending Nolan’s retirement date.” CRAB found that “(t)he extension was relatively short and allowed Nolan—apparently the only employee left after June who was familiar with the STARTS program—to work with a manager to arrange for a limited series of children’s theater performances for the following school year.” CRAB concluded that “although their cooperation in setting this date undoubtedly had elements of collusion, we do not find that Nolan and her employer ‘colluded’ within the meaning of §10(2)(c).” CRAB Decision at 17-18.
I do not find this factual finding by CRAB to be unsupported by substantial evidence. On this factual issue, the court cannot substitute its judgment of the facts for those of the administrative agency, nor can it draw inferences from the facts found, which are con-traiy to the reasonable inferences drawn by the administrative agency.
For these reasons, it is ORDERED as follows:
ORDER
1. Plaintiffs Motion for Judgment on the Pleadings is ALLOWED.
*244 2. The Decision of the Contributory Retirement Appeal Board is reversed and the matter is remanded to the Contributory Retirement Appeal Board to enter an order in accordance with this court’s decision.

he relevant version of this statute is the one in place at the time of the events in 2009 and 2010, s eeAwuahv. Coverall North America, Inc., 460 Mass. 484, 490 n.15 (2011), which was the version effective June 16, 2009. See St. 2009, c. 21, §§9-13. The statute has subsequently been amended.

STARTS presented live theater to school groups in the Lowell area. Nolan was responsible for coordinating programs with various area schools, as well as managing assorted business and administrative matters.

For instance, in some rare cases the superannuation allowance along with the ERIP could be greater than the termination allowance. See CRAB Decision at 8 & n.15. The CRAB decision acknowledges that in this case Nolan is entitled to a greater benefit under the termination allowance.